**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

SUTTON SMITH,

     Plaintiff,

     v.

STATE OF ILLINOIS DEPARTMENT
OF HUMAN SERVICES,

     Defendant.

Case No. 17-cv-3786

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff Sutton Smith sues his employer, the State of Illinois Department of Human Services (DHS), alleging both disability discrimination (Count I) and retaliation (Count II) under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12111, *et seq.* [1]. Defendant moves for summary judgment. [54]. For the reasons explained below, this Court grants Defendant's motion.

## I. Background

The following facts come from Defendant's Local Rule 56.1 statement of material facts, [56], and Plaintiff's statement of additional facts, [63].

### A. Plaintiff's Employment

Plaintiff began working for DHS in July 2010 as a Mental Health Technician Trainee at the Ann Kiley Center (the Center) in Waukegan. [56] ¶ 4. The Center provides twenty-four hour care for its residents, who have intellectual developmental disabilities. *Id.* ¶ 5. After initially working as a Mental Health Technician Trainee,

Plaintiff eventually began working as a Mental Health Technician 1. *Id.* ¶ 6. This role required Plaintiff to care for patients with developmental disabilities by: (1) assisting with their treatment and rehabilitation; (2) helping them develop self-care skills; (3) supervising daily living skills; (4) intervening in crisis situations, which can involve restraints; (5) cooking and cleaning; (6) toileting the individuals; and (7) performing minor repairs. *Id.* ¶ 7. Plaintiff testified that his job duties also required heavy lifting, specifically the ability to transfer an individual from his or her bed to a wheelchair by himself. *Id.* ¶ 8.

As a Mental Health Technician 1, Plaintiff often worked overtime, and such overtime work constituted a mandatory aspect of the position. *Id.* ¶ 9. Further, as a Mental Health Technician 1, Plaintiff belonged to a union, AFSCME; the union's collective bargaining agreement (CBA) governed mandatory overtime assignments. *Id.* ¶¶ 9, 10.

## B. Relevant Attendance Policies

The terms of Plaintiff's employment also subjected him to the DHS Employee Handbook, specifically Section III – Time and Attendance. *Id.* ¶ 11. This section provides, in relevant part:

ATTENDANCE

Employees are expected to be on site, performing required duties during the hours established for their job. Tardiness and absenteeism can place unnecessary burdens on co-workers and affect an[ ] employee's work record. If an employee is unable to report to work, or is going to be late, the employee must contact the supervisor or his or her designees as directed. Absences other than for emergency situations or illness should normally be scheduled in advance with the employee's supervisor. Employees must complete the Staff Request for Time Off (IL444-4140)

> form for all absences or requests for time off and submit it to the supervisor for action. Employees must ensure there is sufficient time to cover a request for time off. If an employee takes time off and has no benefit time available, loss of pay may occur. Excessive and repeated tardiness or absenteeism may be cause for disciplinary action, up to and including discharge.

*Id.* ¶ 11.

The Center's Policy and Procedure also provides guidance on attendance and absenteeism. *Id.* ¶ 13. The relevant section provides, for example, details as to how much notice employees must give to their supervisors prior to an absence in order to receive an authorized absence. *Id.*

Moreover, two memoranda of understanding between AFSCME and the Centers for Medicare and Medicaid Services (CMS)/DHS governed Plaintiff's employment. *Id.* ¶ 14. With respect to attendance, the memorandums clarified:

> All employees' requests for benefit time usage must be supported by a request for time off form submitted by the employee. In accordance with agency practice, requests for available benefit time other than unscheduled sick leave, emergency personal business and inclement weather situations, shall be made reasonably in advance, in writing, using the proper form. Consideration of such requests shall be in accordance with the Master Agreement.
>
> * * *
>
> Supervisors must ensure that the form is readily available to the employee. Failure of the employee to provide this form may result in the absence being considered unauthorized, and the employee may be docked and disciplinary referral may be initiated. If the employee subsequently submits the form within two (2) of the employee's workdays after notification of being docked, the determination of an unauthorized absence shall be corrected.

*Id.* ¶ 14. The memoranda of understanding also set forth a schedule of corrective and progressive discipline for unauthorized absences:

| | |
|---|---|
| 1st | Counseling |
| 2nd | Oral reprimand |
| 3rd | Written reprimand |
| 4th | 2nd Written reprimand |
| 5th | 1 day suspension |
| 6th | 3 day suspension |
| 7th | 5 day suspension |
| 8th | 7 day suspension |
| 9th | 10 day suspension |
| 10th | 15 day suspension |
| 11th | 20 day suspension |
| 12th | Discharge |

*Id.* ¶ 15. For purposes of the schedule, an unauthorized absence without a call-in counts as two offenses. *Id.*

## C. Plaintiff's Injury

On February 4, 2012, Plaintiff reported that he injured himself at work while using a mechanical can opener. *Id.* ¶ 17. On or about that same day, Plaintiff filed a Workers' Compensation claim with Workers' Compensation Coordinator Kathy Chevalier, asserting that he suffered a service-connected injury. *Id.* ¶ 18. In 2012, DHS policy provided it would assign light duty work, if available, to an employee who suffered a service-connected injury or illness, or who was unable to perform regular duties for a period of more than sixty days. *Id.* ¶ 19. DHS required medical

documentation to assess the suitability of a light-duty assignment and made such assignments within the limitations set by the treating physician. *Id.* ¶ 19.

On February 10, 2012, a physician evaluated Plaintiff and diagnosed him with "hand discomfort" and "mild carpal tunnel." *Id.* ¶ 20. The physician cleared Plaintiff to work that same day, with the restriction "work with splints." *Id.* Plaintiff also testified that on February 10, he told Chevalier that his doctor said he "was unable to work," but "asked her questions about options for light duty, FMLA, and short-term disability." [56-3] at 44. According to Plaintiff, Chevalier told him that "no one is able to take light duty." *Id.*

Based upon the February 10, 2012 physician's statement, DHS Human Resources Associate Ivia Ortega requested additional information regarding Plaintiff's weight limitations, if any, as she deemed the medical documentation insufficient to determine whether DHS could assign light duty work to Plaintiff. [56] ¶ 21. In response, Plaintiff provided a physician's statement dated February 13, 2012, which indicated that Plaintiff could not return to work until March 13 and included the "temporary limitation of non-weight-bearing movement of wrists in the splints" at work. *Id.* ¶ 22. Based upon this statement and restriction, DHS determined that Plaintiff could not perform his job duties as a Mental Health Technician 1, and that it could not assign a light duty role to Plaintiff. *Id.* ¶ 23.

On March 14, 2012, Plaintiff began a leave of absence pending the determination of his Worker's Compensation claim. *Id.* ¶ 24. On April 17, 2012, Plaintiff underwent bilateral carpal tunnel release surgery. *Id.* ¶ 25. On or about

May 7, 2012, an independent medical examiner evaluated Plaintiff in connection with his Workers' Compensation claim and released him for full duty work six weeks thereafter. *Id.* ¶ 26. Subsequently, Plaintiff's Worker's Compensation claim was denied based upon this examination. *Id.*

According to a physician's statement from Plaintiff's primary care physician dated May 18, 2012, Plaintiff could go back to work as of June 4, 2012 "unless otherwise stated by surgeon." *Id.* ¶ 27. And according to a form filled out by Plaintiff's surgeon dated May 31, 2012, Plaintiff was cleared to return to work with "no restrictions." *Id.* ¶ 28.

### D. Plaintiff's Injury-Related Absences

Plaintiff's leave of absence expired on June 4, 2012. *Id.* ¶ 29. From June 4, 2012 through June 7, 2012, Plaintiff failed to return to work from his medical leave and did not provide any medical documentation to cover his unexcused absences or to support a continued non-service-connected leave of absence. *Id.* ¶ 30. On June 6, 2012, Plaintiff met with Human Resources Associate Ortega; with Plaintiff present, Ortega called the office of Plaintiff's primary care physician, Dr. Salvi, regarding Plaintiff's medical documentation. *Id.* ¶ 31. Dr. Salvi's office confirmed that it had fully released Plaintiff to return to work. *Id.* On June 6, 2012, Ortega notified one of Plaintiff's supervisors, Lisa Schmidt, that Plaintiff had returned from his medical leave of absence for full duty as of June 4, 2012, with no restrictions, based upon his physician's statement. *Id.* ¶ 32.

### E. Plaintiff's Subsequent Absences

From June 11, 2012 to June 14, 2012, Plaintiff failed to report to work and did not provide any medical documentation to cover his unexcused absences or to support a continued non-service-connected leave of absence. *Id.* ¶ 34. DHS had instructed Plaintiff to bring in medical documentation to cover these days, but he failed to do so. *Id.* ¶ 35.

On June 15, 2012, Plaintiff faxed a physician's statement dated June 11, 2012. *Id.* ¶ 37. This statement contained a lifting restriction of no more than 30 pounds until June 21, 2012. *Id.* According to DHS, it had no light duty work available to accommodate this restriction. *Id.* On that same day, Plaintiff signed out on and was placed on a non-service connected leave of absence. *Id.* ¶ 38. This leave expired on June 21, 2012, and Plaintiff was then cleared to return to work with no restrictions. *Id.* ¶ 39.

On June 22, 2012, Plaintiff learned that Dorothy McCaffrey, Assistant Director at the Center, would conduct a pre-disciplinary meeting due to his unauthorized absences from June 4 through 7, 2012, and from June 11 through June 14, 2012. *Id.* ¶ 40. Following this meeting, Plaintiff received a seven-day paper suspension, effective August 1 through August 8, 2012, for violating DHS' affirmative attendance policy for abuse of time as a result of the unauthorized June absences. *Id.* ¶ 41. Plaintiff did not lose any wages or benefits as a result of this suspension. *Id.*

**F.      Overtime Refusals**

During the months of July and August, 2012, Plaintiff refused to work overtime on 29 separate occasions.  *Id.* ¶ 42.  Plaintiff based this decision upon June 28, 2012 and July 26, 2012 forms from his doctor stating, "No overtime duty" and indicating "[r]estrictions in place for 4 weeks," for 8 total weeks.  *Id.* ¶ 43; [63] ¶ 11.  DHS found these forms inadequate to support the stated restriction, as they did not indicate a diagnosis or explain the restriction, and thus did not constitute valid documentation under DHS policies and the CBA.  [56] ¶ 44.  Plaintiff failed to submit any additional medical documentation justifying or clarifying the purported four-week restriction.  *Id.*

By way of e-mails dated June 29, 2012 and August 2, 2012, Plaintiff's shift supervisors learned that DHS did not accept Plaintiff's overtime restrictions and that he was required to work overtime.  *Id.* ¶ 45.  Plaintiff signed a notice stating that DHS had not accepted his restrictions but wrote that he refuted DHS' decision to refuse the restrictions.  *Id.* ¶ 46.  Mandatory Overtime Refusal Documentation Forms from July and August also reflect that DHS reminded Plaintiff that it expected him to be at work and did not accept his physician's overtime restrictions, but noted that Plaintiff still refused to work overtime.  *Id.* ¶ 47.

Following a pre-disciplinary meeting on September 11, 2012, Plaintiff received a 15-day suspension, effective September 11 through September 25, 2012, for his refusal to work overtime on 29 occasions during July and August 2012.  *Id.*

## G. Plaintiff's Gastroenteritis Hospitalization

On August 6, 2012, Plaintiff sought treatment at an emergency room for gastroenteritis and was released that same day. *Id.* ¶ 49. This occasion marked the first and only time Plaintiff suffered from such an infection. *Id.* ¶ 50. As a result, Plaintiff missed four days of work from August 7 to August 10, 2012. *Id.* ¶ 51. Plaintiff testified that the gastroenteritis made him lethargic and not "very ambulatory." [56-3] at 105.

Plaintiff never made any sort of accommodations request based upon his gastroenteritis, nor did he submit the Staff Request for Time Off (IL444-4140) form for the related August 7 through 10th absences. [56] ¶ 52. In fact, Plaintiff never contacted DHS' Reasonable Accommodations Manager Kim Martinez about information or forms concerning a reasonable accommodation in any capacity from February 2012 through October 2012. *Id.* ¶ 68.

Plaintiff's failure to submit the Staff Request for Time Off forms for the four August absences raised him to a total of 12 incidents of unauthorized time—not including his February absences or his refusals to work overtime. *Id.* ¶ 54. Following the September 11, 2012, pre-disciplinary meeting, Plaintiff received a 30-day suspension pending discharge effective September 26, 2012—simultaneous to his 15-day suspension for overtime refusal—for the unauthorized absences from August 7 through August 10, 2012. *Id.* ¶ 56.

### H. Plaintiff's Discharge and Grievance

On October 11, 2012, DHS notified Plaintiff that the Director of CMS approved its October 4, 2012 written charges seeking his discharge. *Id*. ¶ 57. Plaintiff subsequently received notification of his right to appeal the charges to the State of Illinois' Civil Service Commission within fifteen days or file a grievance pursuant to the CBA. *Id*. ¶ 58. Plaintiff chose to grieve his termination pursuant to the CBA. *Id*. ¶ 59.

In connection with the grievance process, DHS offered Plaintiff a Last Chance Agreement (LCA) that provided, among other items, that Plaintiff would return to work on March 8, 2013 in exchange for releasing any claims arising out of his discharge. *Id*. ¶ 60; [56-3] at 86−87. Plaintiff declined to enter into the LCA. [56] ¶ 61. On March 12, 2013, Plaintiff's grievances were "withdrawn by agreement." *Id*. ¶ 62.

On October 19, 2012, Plaintiff filed a Charge of Discrimination against DHS with the Equal Employment Opportunity Commission (EEOC), alleging ADA violations. *Id*. ¶ 69; [63] ¶ 14. Prior to this charge, Plaintiff concedes that he never made any internal complaints of disability discrimination at DHS. [56] ¶ 70. Plaintiff received a Right to Sue letter on February 27, 2017. *Id*. ¶ 71.

## II. Legal Standard

Summary judgment is proper where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *See CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528 (7th Cir. 2014). The non-moving party has the burden of identifying the evidence creating an issue of fact. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To satisfy that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

## III.   Analysis

### A.     Count I: ADA Discrimination

Generally, plaintiffs can bring an ADA claim based upon two different theories—a failure to accommodate or disparate treatment. *See Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019). As an initial matter, Plaintiff's response memorandum repeatedly states that he brings "an ADA discrimination case based on a failure to accommodate." [64] at 7. Nowhere in his response memorandum does he

address DHS' arguments, included in their motion for summary judgment, that DHS did not engage in disparate treatment discrimination under the ADA, [55] at 9–11. *See generally* [64]. In fact, Plaintiff appears to concede that he does not premise his case upon disparate treatment discrimination, as he notes that "whether Plaintiff suffered adverse employment action or not is not relevant to Plaintiff's discrimination claim." [64] at 8; *see also Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 683 (7th Cir. 2014) (for a disparate treatment claim, a plaintiff must establish, among other factors, "that [he] has suffered an adverse employment action because of his disability.").

At the parties' motion hearing, however, Plaintiff asserted in open court that his discharge constituted an adverse employment action. Thus, to the extent his alternate disparate treatment theory might still exist after Plaintiff's prior concessions, this Court addresses the merits of this form of ADA discrimination based upon his discharge.

In sum, according to Plaintiff, DHS violated the ADA by: (1) failing to provide Plaintiff with reasonable accommodations as a result of his carpal tunnel, [64] at 8; and (2) discharging him based upon his carpel tunnel diagnosis.[1]

To establish a failure to accommodate claim under the ADA, Plaintiff must demonstrate that: (1) he is a qualified individual with a disability; (2) DHS was aware

---

[1] Plaintiff's response memorandum makes no mention of his gastroenteritis diagnosis. *See generally* [64]. At the parties' motion hearing, Plaintiff's counsel clarified that his gastroenteritis diagnosis relates only to his retaliation claim. Accordingly, this Court does not consider Plaintiff's gastroenteritis in connection with Count I.

of his disability (or of the obvious need for an accommodation);[2] and (3) DHS failed to reasonably accommodate that disability. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 813 (7th Cir. 2015) (citing *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 747−48 (7th Cir. 2011)); *Sansone v. Brennan*, 917 F.3d 975, 979−80 (7th Cir. 2019).

To establish a disparate treatment claim under the ADA, Plaintiff must demonstrate that: (1) he satisfies the ADA's definition of disability; (2) he is a qualified individual with a disability; and (3) disability constituted the "but for" cause of adverse employment action. *Scheidler*, 914 F.3d at 541; *Hooper* v. *Proctor Health Care Inc.*, 804 F.3d 846, 853 n.2 (7th Cir. 2015) (plaintiff must show that his disability was a "but for" cause of his termination).

DHS moves for summary judgment on Count I, arguing that Plaintiff: (1) does not meet the ADA's definition of disabled based upon his carpal tunnel diagnosis; (2) fails to establish that he constitutes a "qualified individual"; (3) cannot show that DHS failed to accommodate his purported disabilities; and (4) cannot show an adverse employment action occurred as a result of his carpel tunnel diagnosis. [55] at 4−13.

This Court agrees with DHS and finds that even if Plaintiff's carpal tunnel diagnosis satisfies the ADA's definition of disabled, he cannot demonstrate: (1) that

---

[2] If the applicant or employee does not ask for an accommodation, the employer does not have to provide one unless it knows of the disability. *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995). If a disability and the need to accommodate it are obvious, however, the law does not always require an applicant or employee to expressly ask for a reasonable accommodation. *See id.* at 934 ("[I]t may be that some symptoms are so obviously manifestations of an underlying disability that it would be reasonable to infer that his employer actually knew of the disability. . . . [D]eliberate ignorance [should not] insulate an employer from liability"); *see also Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000) ("[T]here will be exceptions to the general rule that an employee must request an accommodation.") (citing *Bultemeyer v. Fort Wayne Cmty. Schools*, 100 F.3d 1281, 1285 (7th Cir. 1996); 29 C.F.R. § 1630.2(o)(3)).

he constitutes a "qualified individual"; (2) any failure to accommodate his carpal tunnel diagnosis; and or (3) that DHS discharged him based upon his carpel tunnel. As such, this Court need not consider the parties' arguments as to Plaintiff's status as a disabled individual under the ADA.

### 1.      Plaintiff's "Qualified Individual with a Disability" Status

Even assuming that Plaintiff constitutes a disabled individual for purposes of the ADA, the evidence fails to show that he satisfies the requisite "qualified individual with a disability" definition for both his failure to accommodate and disparate treatment theories of discrimination.  Specifically, the record demonstrates that Plaintiff's "temporary limitation of non-weight-bearing movement of wrists in the splints at work," as well as his later 30-pound lifting and overtime restrictions, left him unable to perform the essential functions of the Mental Health Technician 1 role.  [56] ¶¶ 22, 37, 43.

The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015) (citing 42 U.S.C. § 12111(8)).  To determine the essential functions of a given position, courts "generally defer to an employer's determination" of what constitutes essential functions. *Feldman v. Olin Corp.*, 692 F.3d 748, 755 (7th Cir. 2012); *Lloyd v. Swifty Transp. Inc.*, 552 F.3d 594, 601 (7th Cir. 2009) ("The employer, not a court, determines what functions are essential, and we will not second-guess that decision.").  Further, EEOC

regulations advise that essential functions constitute a position's "fundamental job duties," rather than a position's "marginal functions," and that courts should examine the following factors to determine essential functions:

> (i)  The employer's judgment as to which functions are essential;

> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

> (iii) The amount of time spent on the job performing the function;

> (iv) The consequences of not requiring the incumbent to perform the function;

> (v) The terms of a collective bargaining agreement;

> (vi) The work experience of past incumbents in the job; and/or

> (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(1)–(3).  The plaintiff "bears the initial burden of establishing that she was a qualified individual who could perform the essential functions of her position." *Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 493 (7th Cir. 2014).

Here, Plaintiff's qualification argument rests entirely upon his unsupported contention that the Mental Health Technician 1 role did not require "the ability to lift any amount of weight."  [64] at 6.  He argues that because the job description does not specifically reference lifting, and because the job title contains the word "mental," this Court must find that "mental abilities and activities were the essential portions of the position." *Id.*  Not so.

As discussed above, the position's job description constitutes just one of many factors the regulations advise courts to consider. 29 C.F.R. § 1630.2(n)(1)−(3). And here, Plaintiff concedes that: (1) that his job duties required heavy lifting; (2) to "be within [DHS] code to adequately assist an individual, [he] had to be able to transfer the individual from his bed to a wheelchair by himself"; and (3) from June 4 through June 14, 2012, the individual DHS assigned him to assist "needed to be transferred from his bed to a wheelchair, and [he] had to do that by [himself]." [56] ¶ 8; [56-3] at 102−03. As such, given Plaintiff's own testimony as to the importance of lifting to the Mental Health Technician 1 role, the record confirms DHS' judgment that lifting individuals constituted an essential function of Plaintiff's role, and that he could not perform this function due to the splint and 30 pound lifting restrictions. [56] ¶¶ 22, 27.

Further, Plaintiff fails to address the myriad of other job responsibilities affected by his initial "limitation of non-weight bearing movement of wrists in the splints at work." *Id.* ¶ 22. For example, Plaintiff concedes that the Mental Health Technician 1 position required Plaintiff to care for patients with developmental disabilities, including, in relevant part: (1) assisting with their treatment and rehabilitation; (2) supervising daily living; (3) intervening in crisis situations where restraints may be involved; (4) cooking and cleaning; (5) toileting the individuals; and (6) performing minor repairs. *Id.* ¶ 7. Plaintiff offers no indication as to how he could intervene in crisis situations where restraints may be necessary without using weight-bearing movements in his wrists, nor how he could cook, clean, toilet the

individuals, or perform minor repairs with his carpal tunnel impairing his fine motor skills and ability to grip. *See generally* [63] [64]; *see also* [56-3] at 102 ("I couldn't grip properly, I couldn't lift anything heavy, it affected my fine motor skills."). In short, Plaintiff provides no evidence whatsoever that he could perform the essential duties of his job while bearing no weight and wearing splints on both hands.

Additionally, DHS argues that performing overtime constitutes an essential function of Plaintiff's Mental Health Technician 1 role, and therefore, his eight-week "[n]o overtime duty" restriction left him unable to perform an essential function of his job. [55] at 9. Plaintiff fails to address this argument in his response memorandum and otherwise concedes that "overtime was considered mandatory" for his role, pursuant to the CBA. [56] ¶ 9. As such, Plaintiff has waived any argument to the contrary, and the record confirms the position of DHS that overtime constituted an essential function of the job. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).

Finally, Plaintiff points to no reasonable accommodation, other than general and unspecified "light duty assignments" that DHS purportedly could have provided him to enable him to perform the essential functions of his job, or those of any other vacant position or assignment. [63] ¶ 5; *see also Dunderdale*, 807 F.3d at 853 (defining a "qualified individual with a disability" as "an individual with a disability who, *with or without reasonable accommodation*, can perform the essential functions of the employment position that such individual holds or desires.") (emphasis added). And without any specific (and reasonable) request, the law does not require DHS to

completely restructure its workplace to accommodate Plaintiff.  *See Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th & 22nd Judicial Cirs.*, 601 F.3d 674, 680 (7th Cir. 2010) ("An employer need not create a new job or strip a current job of its principal duties to accommodate a disabled employee."); *cf. Feldman*, 692 F.3d at 755−56 (denying summary judgment where plaintiff with an overtime restriction pointed to several vacant straight-time positions and argued he possessed sufficient qualifications for them).

In sum, the essential functions of Plaintiff's job included overtime work, lifting patients, and intervening in crisis situations with restraints, among other responsibilities requiring weight-bearing movements and dexterity.  Plaintiff's various restrictions limited him to no overtime work, "non-weight-bearing" wrist movements in splints and lifting no more than 30 pounds.  [56] ¶¶ 22, 37, 43.  And he provided no evidence as to a vacant position or alternative assignment that DHS could have provided him as a reasonable accommodation.  Therefore, this Court finds that no genuine issue of fact exists as to whether Plaintiff constitutes an individual "who, with or without reasonable accommodation, could perform the essential functions" of the Mental Health Technician 1 role.  *Dunderdale*, 807 F.3d at 853.  As such, both Plaintiff's failure to accommodate and disparate treatment theories of ADA discrimination fail on this ground.

### 2.      Failure to Accommodate Claim: Reasonable Accommodation Requests

Even if Plaintiff could establish "qualified individual with a disability" status, this Court finds, for the reasons explained below, that he cannot demonstrate a

genuine issue of fact as to whether DHS failed to accommodate him. Because Plaintiff argues that DHS failed to accommodate on multiple occasions, this Court analyzes each alleged instance in turn.

### a.     The February 10, 2012 Conversation

First, Plaintiff claims that DHS failed to provide a reasonable accommodation when on February 10, 2012, he "spoke with [Workers' Compensation Coordinator] Kathy Chevalier about his weight restriction and asked for light duty work," and Chevalier responded that "no one is able to take light duty." [64] at 8–9.[3] Thus, Plaintiff argues that Chevalier "did not even look into whether there was any light duty available." *Id.* at 9. Construed generously, Plaintiff appears to argue that Chevalier, on behalf of DHS, failed to engage in the "interactive process" under the ADA. Not so.

True, to determine an appropriate reasonable accommodation under the ADA, employers cannot simply deny reasonable accommodations with no explanation. Instead, based upon the circumstances, employers may need to "initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation." *Ozlowski v. Henderson*, 237 F.3d 837, 840 (citing 29 C.F.R. § 1630.2(o)(3)). The interactive process imposes "a duty on employers to engage in a flexible give-and-take with the disabled employee so that together they can determine what accommodation would enable the employee to continue working." *EEOC v.*

---

[3] Although DHS argues that this comment constitutes inadmissible hearsay, [76] at 9, based upon Chevalier's status as a DHS employee speaking to Plaintiff within the scope of her employment, it constitutes, among other things, a non-hearsay admission by a party opponent under Federal Rule of Evidence. 801(d)(2)(D).

*Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005) (citing 29 C.F.R. § 1630.2(o)(3)).

But "[f]ailure to engage in this 'interactive process' cannot give rise to a claim for relief . . . if the employer can show that no reasonable accommodation was possible." *Id.* (quoting *Hansen v. Henderson*, 233 F.3d 521, 523 (7th Cir. 2000)). Therefore, courts must look first to whether a genuine issue of material fact exists regarding the availability of a reasonable accommodation, "and if it is clear that no reasonable accommodation was available [courts] stop there." *Id.* (citing *Ozlowski*, 237 F.3d at 840). Under the ADA, Plaintiff bears the burden of showing that a reasonable accommodation existed for which he was qualified. *Ozlowski*, 237 F.3d at 840; *Kotwica v. Rose Packing Co.*, 637 F.3d 744, 750 (7th Cir. 2011) ("[P]laintiffs, when alleging that an employer's failure to reassign them violated the ADA's anti-discrimination provisions, bear the burden of showing that there is a vacant position in existence for which they are qualified."). In order to be "qualified," the employee must "satisfy the legitimate prerequisites for that alternative position" or role and "be able to perform the essential functions of that position with or without reasonable accommodations." *Ozlowski*, 237 F.3d at 840 (citing *Dalton v. Subaru-Isuzu Automotive, Inc.*, 141 F.3d 667, 678 (7th Cir. 1998)).

Here, Plaintiff's claim fails for the simple reason that he provides no evidence whatsoever as to whether a vacant role or light duty assignment even existed at DHS, much less one for which he possessed sufficient qualifications. *See generally* [63] [64]. In fact, he provides no evidence as to what reasonable accommodations he even

sought from DHS in February 2010, other than the fact that he "asked [Chevalier] about the option to work light duty," and considered "light duty" to mean "[a]ctivities that would have accommodated [his] injuries." [63] ¶ 6; [56-3] at 44. For example, he provides no testimony or evidence: (1) demonstrating what tasks he could complete despite his weight restrictions; (2) what "light duty" work might entail at DHS; (3) or what other roles, aside from Mental Health Technician 1, he possessed sufficient qualifications to fill. *See generally* [63] [64]. Absent any evidence in the record as to vacant positions or light duty assignments that existed at DHS (and Plaintiff's ability to perform the functions of those theoretical positions or assignments), this Court finds that Plaintiff has failed to meet his burden under the ADA. *See, e.g.*, *Kotwica*, 637 F.3d at 750 (affirming summary judgment on failure to accommodate claim where plaintiff "did not present any evidence establishing that there were vacant positions [with defendant] at the time of her termination").

Although Plaintiff's failure to meet this burden requires this Court to find for Plaintiff without further analysis, *Sears, Roebuck*, 417 F.3d at 840, it remains worth noting that the interactive process here did not end with Plaintiff and Chevalier's short conversation. Rather, Plaintiff ignores that DHS clearly made efforts to continue engaging with Plaintiff following this conversation.

Specifically, DHS Human Resources Associate Ortega reviewed Plaintiff's February 10, 2012 physician's statement, which cleared Plaintiff to work immediately and included the following restriction: "work with splints." [56] ¶ 20. Ortega determined that she could not make an informed decision about whether DHS had

light duty assignments for Plaintiff based upon this restriction. *Id.* ¶¶ 20–21. Accordingly, she requested additional information regarding Plaintiff's weight limitations. *Id.*

In response, Plaintiff provided a physician's statement dated February 13, 2012, which indicated: (1) he could not return to work until March 13, 2012; and (2) a "temporary limitation of non-weight-bearing movement of wrists in the splints at work." *Id.* ¶ 22. Based upon this statement and restriction, DHS determined that Plaintiff could not perform his job duties as a Mental Health Technician 1, and that it could not assign a light duty role to Plaintiff. *Id.* ¶ 23. DHS instead authorized Plaintiff to take a medical leave of absence, beginning March 14, 2012, pending the determination of his Worker's Compensation claim. *Id.* ¶ 24.

In short, the record demonstrates that DHS engaged in the interactive process, contrary to Plaintiff's claim. And even if DHS had failed to do so, this Court must grant summary judgment due to Plaintiff's failure to present evidence regarding alternative roles or assignments.

### b. Overtime Restrictions

Plaintiff's second failure to accommodate claim relies upon two notes dated June 28, 2012, and July 26, 2012, which indicated that he could not work overtime. [64] at 9. According to Plaintiff, DHS discriminated against him by failing to accommodate this overtime restriction. [64] at 9–10. Defendant moves for summary judgment, arguing that Plaintiff's failure to clarify the extent of his medical restrictions through these medical notes dooms his claim. [76] at 11. This Court

agrees with DHS and finds that Plaintiff's claim fails, because he failed to provide DHS with sufficient information to accommodate his overtime request.

Under the ADA, an employer is entitled to judgment as a matter of law if an employee refuses to cooperate in good faith during the interactive process, discussed above. *Hoppe v. Lewis Univ.*, 692 F.3d 833, 840 (7th Cir. 2012) (citing *Steffes v. Stepan Co.*, 144 F.3d 1070, 1073 (7th Cir. 1998)). In other words, although an employer must engage in the interactive process in good faith, an "employee who fails to uphold her end of the bargain—for example, by not 'clarifying the extent of her medical restrictions'—cannot impose liability on the employer for its failure to provide a reasonable accommodation." *Id.* (citing *Steffes*, 144 F.3d at 1073); *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1330, 1136 (7th Cir. 1996) ("Where the missing information is of the type that can only be provided by one of the parties, failure to provide the information may be the cause of the breakdown and the party withholding the information may be found to have obstructed the [interactive] process."). Here, Plaintiff has undoubtedly failed to clarify the extent of his medical restrictions. *Id.*

The 2012 Work Status Forms from Plaintiff's physician stated, "No overtime duty" and indicated "[r]estrictions in place for 4 weeks." [56] ¶ 43. They did not indicate a diagnosis or otherwise explain the scope of the restriction in any detail whatsoever, such as whether the overtime restriction only limited work involving lifting of certain weight, or whether it constituted a blanket limitation on all work. *Id.* ¶ 44. As such, the physician forms did not sufficiently clarify his medical restrictions. *See Hoppe*, 692 F.3d at 837, 840 (affirming summary judgment where

doctor's letter requested that plaintiff's office be relocated to accommodate her adjustment disorder and failed to identify a suitable replacement location); *Steffes*, 144 F.3d at 1072 (finding physician's letter that "elaborated on the nature of [plaintiff's] medical condition" and explained that "she has been advised to avoid chemical exposure" to constitute insufficient "blanket" restrictions that required plaintiff to "update or further clarify the kinds of work she could do").

Plaintiff counters that DHS never notified him that any of the documents he submitted constituted inadequate submissions. [64] at 10. But Plaintiff concedes that he signed a notice that DHS did not accept his restrictions, and Mandatory Overtime Refusal Documentation Forms dated July 3, 2012, and August 3, 2012 also informed Plaintiff that DHS, in fact, did not accept his physician's overtime restriction. [56] ¶¶ 46−47. Plaintiff also acknowledges that he failed to submit any other medical documentation clarifying the restriction. *Id.* ¶ 44. Based upon this record, this Court finds that Plaintiff inadequately clarified the extent of his medical restrictions. *See Steffes*, 144 F.3d at 1072 (affirming summary judgment on ADA claim where plaintiff "did not provide any further information to the company" and thus "failed to hold up her end of the interactive process by clarifying the extent of her medical restrictions"); *cf. Braddock v. UPS*, No. 1:14-cv-03839, 2017 WL 770973, *3 (N.D. Ill. Feb. 28, 2017) (finding medical evaluation sufficient where doctor diagnosed plaintiff's medical condition and specified that plaintiff could not perform any work in temperatures below 68 degrees).

Finally, Plaintiff argues that DHS failed to accommodate his overtime restrictions because when he brought issues relating to his wrists and ability to lift to Ortega on June 6, 2012: (1) Ortega did not direct him to fill out any specific forms to ask for reasonable accommodations; and (2) HR representative Betty Valea overheard their conversation and told Plaintiff he should quit his position. [64] at 10; [63] ¶ 9. Notwithstanding the fact that this event occurred weeks before Plaintiff submitted the first June 28, 2012 physician's form, Plaintiff concedes that at this meeting, Ortega called the office of Plaintiff's primary care physician, who confirmed that it had fully released Plaintiff to work. [56] ¶ 31. As such, Ortega had no reason to instruct Plaintiff to fill out any specific form to ask for reasonable accommodation. Moreover, Plaintiff provides no evidence or argument as to how Valea's comment, made after simply overhearing his conversation with Ortega, possibly relates to the later overtime requests. For example, he fails to show whether she played any role in approving accommodation requests generally, much less Plaintiff's overtime restriction forms.

Accordingly, this Court finds that no genuine issue of material fact exists as to Plaintiff's overtime-based failure to accommodate claim, and thus grants summary judgment to the extent it is included in Count I.

### 3.    Disparate Treatment Claim: Discharge

As noted above, at the parties' motion hearing, Plaintiff articulated—for the first time—an ADA disparate treatment claim based upon DHS' decision to discharge him. To establish a disparate treatment claim under the ADA, Plaintiff must

demonstrate that he: (1) satisfies the ADA's definition of disability; (2) is a qualified individual with a disability; and (3) disability constituted the "but for" cause of adverse employment action. *Scheidler*, 914 F.3d at 541. Here, the record confirms that Plaintiff has failed to establish "qualified individual" status (as noted above), and no genuine issue of fact exists as to whether his carpel tunnel diagnosis constituted the "but for" cause of his discharge. As such, this Court grants summary judgment as to Plaintiff's disparate treatment claim.

Pursuant to the terms of the memoranda of understanding between AFSCME and CMS/DHS, each unauthorized absence constitutes a separate offense, and twelve or more unauthorized absences result in discharge. [56] ¶ 15. Not including the absences related to Plaintiff's failure to accommodate claims, Plaintiff also incurred unauthorized absences on June 4, 2012, June 5, 2012, June 6, 2012, June 7, 2012, June 11, 2012, June 12, 2012, June 13, 2012, and June 14, 2012—eight unauthorized absences in total. *Id*. ¶¶ 30, 34. These absences thus resulted in a seven day suspension under DHS' policy. *Id*. ¶ 41.

Subsequently, despite receiving counseling regarding the attendance policies, Plaintiff again acquired unauthorized absences for August 7, 2012, August 8, 2012, August 9, 2012, and August 10, 2012—his ninth through twelfth unauthorized absences, respectively—again unrelated to the absences related to his failure to accommodate claims. *Id*. ¶ 51. Plaintiff thus received a 30-day suspension pending discharge pursuant to the memoranda of understanding between AFSCME and the Centers for Medicare and Medicaid Services (CMS)/DHS. *Id*. ¶¶ 15, 56. For each of

the twelve absences upon which Plaintiff based his discharge, Plaintiff provided no medical documentation whatsoever to cover his unexcused absences. *Id*. ¶¶ 30, 34, 52.

Based upon this record, this Court does not find any genuine issue of fact as to the "but for" cause of Plaintiff's discharge. *Scheidler*, 914 F.3d at 541. Rather, the record clearly demonstrates that DHS discharged Plaintiff because of his twelve unexcused absences, in line with the memoranda of understanding. Further, Plaintiff offers no evidence that DHS based its discharge decision upon any reason other than these unauthorized absences. *See also E.E.O.C. v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 949 (7th Cir. 2001) (explaining that "in most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability" because "in most cases, attendance at the job site is a basic requirement of most jobs") (citing *Waggoner v. Olin Corp.*, 169 F.3d 481, 484–85 (7th Cir. 1999)).

For the reasons explained above, this Court grants DHS' motion for summary judgment as to Count I.

### B.    Count II: ADA Retaliation

To establish an ADA retaliation claim, Plaintiff must demonstrate that he engaged in protected activity, suffered an adverse action, and that a causal connection exists between the two. *Rowlands v. UPS*, 901 F.3d 792, 801 (7th Cir. 2018). Following the Seventh Circuit's decision in *Ortiz v. Werner Enterprises*, 834 F.3d 760, 764 (7th Cir. 2016), the legal standard for such claims "is simply whether

the evidence would permit a reasonable factfinder to conclude" that Plaintiff's protected activities caused the adverse action. *Rowlands*, 901 F.3d at 801 (quoting *Ortiz*, 834 F.3d at 765).

According to Plaintiff, DHS retaliated against him by: (1) discharging him after he filed his EEOC charge, [64] at 10; and (2) using the LCA to preclude Plaintiff from pursuing charges against DHS, *id.* at 13. DHS moves for summary judgment because: (1) Plaintiff filed his EEOC charge after the Director of CMS approved DHS' written charges seeking his termination, and thus no causal connection exists between the two; and (2) DHS offered Plaintiff the LCA after his termination, and thus Plaintiff cannot identify any causal connection to an adverse employment action. [76] at 12–15. This Court agrees with DHS.

With respect to Plaintiff's EEOC charge retaliation theory, Plaintiff concedes that he filed his EEOC charge on October 19, 2012. [63] ¶ 14. Moreover, he concedes that on October 11, 2012—eight days earlier—DHS notified him that the CMS Director approved DHS' October 4, 2012 written charges seeking his discharge. [56] ¶ 57. Accordingly, because DHS discharged Plaintiff before he filed his EEOC charge, this Court finds no causal connection between the two events. *See Guzman v. Brown Cty.*, 884 F.3d 633, 642 (7th Cir. 2018) (holding that "actions taking place after an employee has already been terminated do not constitute adverse employment actions") (citing *Reed v. Shepard*, 939 F.2d 484, 492–93 (7th Cir. 1991)); *see also Durkin v. City of Chi.*, 341 F.3d 606, 614–15 (7th Cir. 2003) (explaining in a Title VII

case that it "is axiomatic that a plaintiff engage in statutorily protected activity before an employer can retaliate against her for engaging in statutorily protected activity.").

Plaintiff's LCA-based retaliation claim also fails. Following his discharge, Plaintiff chose to grieve his termination pursuant to the CBA; in connection with this process, DHS offered Plaintiff the LCA agreement which provided, in part, that Plaintiff would return to work on March 8, 2013 in exchange for waiving any claims arising out of his discharge. [56] ¶¶ 59–60; [56-3] at 86–87. Plaintiff thus asks this Court to find, without citing to any caselaw or record evidence, that the mere receipt of a LCA *after* termination constitutes an adverse employment action. [64] at 12–13.[4] The Seventh Circuit, however, has already rejected such a theory of retaliation.

In *Isbell v. Allstate Insurance Company*, 418 F.3d 788 (7th Cir. 2005), a former Allstate employee brought an age discrimination claim against the company after it terminated 6,400 employees as part of a restructuring plan. *Id*. at 791–92. As part of the restructuring process, Allstate offered the terminated employees an option to return as independent contractors, provided they signed a release waiving any discrimination claims arising out of their termination. *Id*. As in this case, the *Isbell* plaintiff argued that Allstate retaliated against her when it refused her "the opportunity to work for Allstate albeit under a different contract unless she signed the release." *Id*. at 793.

---

[4] In support of his LCA-based retaliation argument, Plaintiff cites only to the EEOC's determination of reasonable cause as to retaliation. [64] at 12–13. But an EEOC reasonable cause finding exists solely as "an administrative prerequisite to a court action and has no legally binding significance in subsequent litigation." *Walker v. Mueller Indus.*, 408 F.3d 328, 331 (7th Cir. 2005) (citing *EEOC v. Harvey L. Walner & Assocs.*, 91 F.3d 963, 968 n.3 (7th Cir. 1996)). Accordingly, the EEOC's reasonable cause determination cannot, by itself, preclude summary judgment.

The Seventh Circuit rejected this argument, finding that Allstate did not retaliate against plaintiff because it did not terminate her for declining to sign the release. *Id*. at 793. Rather, it terminated her because of Allstate's restructuring plan. *Id*. Moreover, it found the release to be a valid agreement because it offered "various incentives and benefits"—namely, a new job as a contractor—"in exchange for the release." *Id*. (explaining that for a release to be valid, "like all agreements, [it] must be supported by consideration").

Here, as in *Isbell*, DHS did not terminate Plaintiff because he refused to sign the LCA. Instead, it discharged him because of his twelve unauthorized absences, discussed above. Further, like the release in *Isbell*, the LCA constituted a valid agreement, as it offered Plaintiff the benefit of a new employment contract in exchange for waiving any claims based upon DHS' actions prior to his termination. 418 F.3d at 793; [56] ¶ 60; [56-3] at 86−87. Therefore, because: (1) DHS did not terminate Plaintiff for failing to sign the LCA; and (2) the LCA constitutes a valid agreement, no reasonable factfinder could find retaliation based solely upon Plaintiff's receipt of the LCA.

In addition to these two arguments, Plaintiff's response memorandum offers two additional theories of retaliation. First, he notes that when Valea told Plaintiff he should quit after overhearing his conversation with Ortega, Plaintiff complained about this statement in a letter to DHS. [64] at 12. But even if writing this letter constitutes a protected activity, Plaintiff fails to identify: (1) any adverse employment action connected to this letter; (2) who specifically received the letter; (3) whether

Valea knew about the letter; and or (4) evidence that Valea played a role in any of DHS' disciplinary decisions against Plaintiff. *See id.* As such, Plaintiff's letter fails to create any inference of a causal connection to Plaintiff's discharge. *See Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 905 (7th Cir. 2005) (affirming district court's conclusion that "at the summary judgment stage courts are not required to draw every conceivable inference from the record, . . . only reasonable ones.") (internal quotations omitted).

Finally, at the parties' motion hearing, Plaintiff alluded to the fact that his gastroenteritis condition relates to his retaliation claim. At both oral argument and in his response memorandum, however, Plaintiff failed to identify: (1) any protected activity he engaged in as a result of his gastroenteritis episode; or (2) offer any evidentiary connection between his gastroenteritis diagnosis and any adverse employment action taken against him by DHS. *See generally* [63] [64]. Instead, Plaintiff concedes that he never made any sort of accommodations request based upon his gastroenteritis, nor did he submit the Staff Request for Time Off (IL444-4140) form for his August 7 through 10th absences based upon the gastroenteritis. [56] ¶ 52.

In short, the evidence regarding Plaintiff's discharge and disciplinary history reflects that DHS ultimately terminated him based upon his twelve unauthorized absences, for which he provided no medical documentation—not because of his carpal tunnel, gastroenteritis, or any requests for accommodations. Therefore, this Court grants Defendants' motion for summary judgment as to Count II.

## IV. Conclusion

This Court grants Defendant's motion for summary judgment [54]. The Clerk shall enter judgment for Defendant and against Plaintiff. All dates and deadlines are stricken. Civil case terminated.

Dated: February 24, 2020

John Robert Blakey
United States District Judge